## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| |
|---|
| ERIK BROWN, <br>        Plaintiff, <br>                v. <br> WATERBURY BOARD OF <br> EDUCATION and DR. KATHLEEN <br> OUELLETTE, in her individual capacity, <br>        Defendants. |

No. 3:15-cv-00460 (MPS)

## <u>MEMORANDUM OF DECISION</u>

The plaintiff, Erik Brown, has sued the defendants, Waterbury Board of Education ("Board") and Dr. Kathleen Ouellette in her individual capacity, because the defendants allegedly demoted the plaintiff from his position as principal of Walsh Elementary School on account of his race. The plaintiff filed a six-count Amended Complaint on August 3, 2015. In Count One, the plaintiff asserted a race discrimination claim under Title VII of the Civil Rights Act of 1964 against the Board. In Count Two, the plaintiff asserted a race discrimination claim under 42 U.S.C. §§ 1981 and 1983 against Dr. Ouellette in her individual capacity. In Count Three, the plaintiff asserted a retaliation claim under Title VII against the Board. In Count Four, the plaintiff asserted a state-law defamation claim against the Board and Dr. Ouellette. In Count Five, the plaintiff asserted an intentional infliction of emotional distress claim against the Board and Dr. Ouellette. The Amended Complaint also included a § 1983 claim (referred to as "Count Three (A)")[1] against Dr. Ouellette in her individual capacity based on an alleged Fourteenth Amendment due process violation.

The defendants move to dismiss Counts Two, Three, Four, Five, and Three (A) of the plaintiff's Amended Complaint for failure to state a claim upon which relief can be granted. For

---

[1] The plaintiff did not change the numbering of the claims in his Amended Complaint when he added the due process claim. Therefore, there are two claims titled "Count Three" in the Amended Complaint. This Court will refer to the retaliation claim as "Count Three" and the due

the reasons discussed below, the defendants' Motion to Dismiss is GRANTED IN PART and DENIED IN PART. The plaintiff has stated a claim in Counts Two, Three and Three (A), but has failed to state a claim in Counts Four and Five. The following claims remain: Count One, Count Two, Count Three, and Count Three (A).

## I.    Factual Allegations

The Amended Complaint alleges the following facts. The plaintiff, Erik Brown, an African-American, was the principal of Walsh Elementary School ("Walsh") for almost eight years. (ECF No. 17 at ¶ 3.) The defendant, Dr. Kathleen M. Ouellette, who is white, was the Superintendent of Schools for the Board. (*Id*. at ¶ 5.)

The plaintiff was a "hands-on" principal who took pride in Walsh and its students. (*Id*. at ¶ 25.) His goal always had been to improve Walsh's academic scores, and he welcomed input and suggestions from his staff to help achieve his goal. (*Id*. at ¶ 9.) Walsh is in a blighted neighborhood, but the plaintiff took pride in his building and "went out of his way" to ensure that the premises were well maintained. (*Id*. at ¶ 15.) He oversaw the development of a modern library and made sure that Smart Boards were available in almost every classroom. (*Id*.) The plaintiff also instituted daily assemblies "to foster a community-type gathering for staff and students" in an attempt to create "a safe and positive school environment." (*Id*. at ¶ 10.) He knew most of the children by name, and promoted a "familial feeling" at the school. (*Id*. at ¶ 16.) Students under the plaintiff's supervision were well behaved and suspensions declined dramatically during his tenure. (*Id*.)

Walsh was labeled a "turnaround" school by the Board, but was not scheduled to receive additional state funding until the 2013–14 fiscal year. (*Id*. at ¶ 13.) This led the plaintiff to cultivate a relationship with the Department of Children and Families ("DCF"). (*Id*. at ¶ 14.)

With the help of DCF, the plaintiff developed a "support team," which hosts an annual fair that provides over fifteen-hundred residents with medical care, housing, clothing, food, and after-school educational support. (*Id*.) The plaintiff also tried to establish a Literacy Academy at Walsh, but lacked adequate resources. (*Id*. at ¶ 20.)

Despite the improvements Walsh had made under the plaintiff's supervision, the defendants held a meeting near the summer of 2012 where they decided to make changes to Walsh's educational mission and system. (*Id*. at 13, ¶ 33.)[2] During this meeting, the plaintiff was informed that he might be transferred to another school district due to Walsh's low test scores. (*Id*. at 13, ¶ 34.) In response, the plaintiff called an open meeting with the Walsh community to discuss his possible departure and the proposed changes at Walsh. (*Id*. at 13, ¶ 35.) About eighty members of the Walsh community, including staff and parents, attended the meeting. (*Id*.) Dr. Ouellette also attended. (*Id*.)

Most of the teachers at Walsh blamed the plaintiff for the low level of student achievement. (*Id*. at ¶ 20.) The plaintiff was "accused of being insubordinate for not establishing a [so-called] 'Comer school'[3] and for not having a 'Professional Learning Community'" even though the plaintiff did not have the autonomy or resources to implement either model in a comprehensive fashion. (*Id*. at ¶ 27.) The plaintiff worked "to obtain the academic, staffing and financial assistance Walsh needed to improve," but the defendants would not help him. (*Id*. at ¶ 24.) Instead he was targeted as a scapegoat for the school's problems. (*Id*.)

---

[2] The plaintiff formatted his Amended Complaint so that paragraphs 33–44 allege different facts for each claim. For clarity, every citation to a paragraph from the Amended Complaint numbered 33–44 will be formatted as follows: ([ECF No.] at [page number], ¶).

[3] A 'Comer school' is a school that has adopted the Comer School Development Program developed by Dr. James Comer at the Child Study Center of Yale University. *Abbott ex rel. Abbott v. Burke*, 153 N.J. 480, 552, 710 A.2d 450, 486 (1998).

On March 22, 2013, following the completion of a state audit report, the plaintiff was placed on paid administrative leave (*id*. at ¶ 7), pending an investigation by an outside attorney hired by Dr. Ouellette into whether the plaintiff had created an atmosphere of fear and intimidation at Walsh, (*id*. at 10, ¶ 35). The plaintiff alleges that he has never threatened any of his staff. (*Id*. at ¶ 8.) He also alleges that no grievances had been filed against him and his evaluations had been exemplary until he was placed on administrative leave. (*Id*.) None of his evaluations contained any specific recommendation or suggestion that he should improve his relations or communication with staff. (*Id*.) In response to his placement on administrative leave, the plaintiff filed complaints with the Connecticut Commission on Human Rights and Opportunities ("CHRO") and the United States Equal Employment Opportunities Commission ("EEOC") alleging discrimination by the defendants on account of his race. (*Id*. at ¶ 31.)

The investigation of the audit report allegations concluded that the plaintiff was "unfit to continue as Walsh's Principal . . . and that some remedial action had to immediately be taken." (*Id*. at 12, ¶ 36.) On July 26, 2013, the plaintiff was demoted to assistant principal at Kingsbury Elementary School with a lower salary. (*Id*. at ¶ 21.) Two other principals in the school district, who were white, had faced similar accusations of intimidation and bullying, but were never placed on administrative leave or demoted like the plaintiff. (*Id*. at ¶ 28.)

The plaintiff alleges that he was treated in a discriminatory and retaliatory manner because of his race. (*Id*. at ¶ 30.) Dr. Ouellette in particular constantly harassed the plaintiff, and responded to the plaintiff's concerns with a cavalier attitude. (*Id*. at 10, ¶ 38.) She generally communicated with the plaintiff in a sarcastic, condescending, and demeaning manner. (*Id*.)

The audit report containing the allegations regarding the plaintiff and the results of the subsequent investigation of that report were released to a local newspaper (*id*. at ¶ 22), and

details of the plaintiff's placement on administrative leave were released to a local television news station, NBC Connecticut ("NBC30") (*id*. at 16, ¶ 34). As a result, NBC30 reported that the plaintiff was, "accused of singling people out, and chastising them in front of the group if they weren't participating in an activity." (*Id*. at 16, ¶ 35.) This humiliated the plaintiff and damaged his professional reputation (*id*. at 15, ¶ 33) so that he may never again work as a school principal (*id*. at 16, ¶ 37).

Since being demoted and having personal details of his demotion released to the public, the plaintiff has been seeing a counselor for emotional problems and distress. (*Id*. at 16, ¶ 33.) The defendants' conduct caused the plaintiff severe emotional distress, money problems, family problems, a decrease in self-esteem and self-worth, and a loss of sleep, appetite, and employment.  (*Id*. at 17, ¶ 36.)

## II.    Legal Standard

For a complaint to survive a motion to dismiss brought under Fed. R. Civ. P. 12(b)(6), it must, "contain sufficient factual matter, accepted as true, to state a claim that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. A claim has facial plausibility when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.

A plaintiff need not provide detailed factual allegations, but must provide the grounds of its entitlement to relief beyond mere "labels and conclusions." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). When examining allegations in a complaint, the Court should assume the veracity of the pleaded factual allegations and "determine whether [those allegations]

plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 664. The complaint must, at a minimum, assert nonconclusory factual assertions sufficient to push the claims across the line from conceivable to plausible in order to proceed. *Id.* at 680. The Court is required to view the complaint liberally, accepting all factual allegations in the complaint as true and drawing all reasonable inferences in the plaintiff's favor. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 156 (2d Cir. 2002).

## III.   Discussion

### A.   Count Two: Race Discrimination Claim Under 42 U.S.C. § 1981 and 42 U.S.C. § 1983 Against Dr. Ouellette in Her Individual Capacity.

Section 1983 creates a cause of action for plaintiffs to enforce federal rights created elsewhere—such as § 1981. *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 618 (1979). "To establish a claim under 42 U.S.C. § 1981, plaintiffs must allege facts supporting the following elements: (1) plaintiffs are members of a racial minority; (2) defendants' intent to discriminate on the basis of race; and (3) discrimination concerning one of the statute's enumerated activities." *Brown, et al v. City of Oneonta*, 221 F.3d 329, 339 (2d Cir. 1999). There is no dispute that the plaintiff, as an African-American, is a member of a racial minority. (ECF No. 17 at ¶ 3.) Similarly, the third element is satisfied because demotions and salary decreases qualify as an enumerated activity under § 1981. *Baker v. McDonald's Corp.*, 686 F. Supp. 1474, 1481 (S.D. Fla. 1987), *aff'd*, 865 F.2d 1272 (11th Cir. 1988). The only issue is whether the plaintiff has plausibly alleged that Dr. Ouellette intended to discriminate on the basis of race. To "survive a motion to dismiss, a plaintiff bringing a section 1981 claim must allege with specificity 'circumstances giving rise to a plausible inference of racially discriminatory intent.'" *Johnson v. City of New York*, 669 F. Supp. 2d 444, 450 (S.D.N.Y. 2009) (quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 713 (2d Cir. 1994)).

The defendants argue that the plaintiff has failed to allege sufficient facts to support a finding of intentional discrimination under § 1981. (ECF No. 21, at 5.) According to the defendants, many of the plaintiff's allegations are "wholly conclusory" and fail to "include any supporting factual allegations." (*Id*. at 8.) Furthermore, the defendants contend that the plaintiff fails to provide any examples of actions or statements made by Dr. Ouellette to support the discrimination claim. (*Id*. at 7.)

While the plaintiff does not attribute specific statements to Dr. Ouellette in the Amended Complaint, he has alleged facts to make it plausible that she discriminated against him because of his race. The plaintiff alleges that the defendants treated two other white principals, who also received complaints of bullying and intimidation, differently from the plaintiff. (ECF No. 17 at ¶ 28.) The defendants demoted the plaintiff, an African-American male, after receiving complaints that he had bullied and intimidated his staff. (*Id*. at ¶ 21.) The plaintiff also alleged that, by contrast, "[o]ther similarly situated Caucasian of race and white of color Principals in the District who were the target of the same type of allegations of bullying and intimidations, mismanagement and/or lack of discipline regarding students, were never subjected to being transferred and/or demoted from their positions as Principal." (*Id*. at ¶ 23.) The plaintiff has plausibly alleged that this inconsistency in disciplinary action can be attributed to race.

The defendants argue that the plaintiff has failed to allege that Dr. Ouellette was the individual responsible for disciplining the two white principals. (ECF No. 21, at 7.) When the facts are read in a light most favorable to the plaintiff, *Chambers*, 282 F.3d at 156, however, a connection between Dr. Ouellette and the lack of disciplinary action against the two white principals reasonably can be inferred. The plaintiff has alleged that Dr. Ouellette was the Superintendent of Schools in Waterbury at all times relevant to this complaint, and that, as such,

she was involved in the decision to discipline him. (ECF No. 17 ¶'s 5, 37.) The plaintiff has also alleged that the two white principals worked in the same district as the plaintiff. (*Id.* at ¶ 23.) Therefore, the plaintiff has alleged facts sufficient to show a causal nexus between Dr. Ouellette and the treatment of the white principals. The defendants' Motion to Dismiss is thus denied with respect to Count Two.

**B.      Count Three: Retaliation Claim Under Title VII Against the Board.**

To establish a prima facie case of retaliation under Title VII, a plaintiff must show that "(1) she was engaged in an activity protected under Title VII; (2) the employer was aware of plaintiff's participation in the protected activity; (3) the employer took adverse action against plaintiff; and (4) a causal connection existed between plaintiff's protected activity and the adverse employment action taken by the employer." *Gordon v. NYC Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000). The parties dispute only the fourth element, i.e., whether the plaintiff has adequately alleged that there was a causal connection between the plaintiff's protected activity and the adverse employment actions to which he was subjected.

In a retaliation claim, the causation element can be shown either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon*, 232 F.3d at 117.

The defendants rely on the Second Circuit's opinion in *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001), which held, "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." The defendants argue that the

plaintiff engaged in protected activity *after* gradual adverse job actions began, because the plaintiff was placed on paid administrative leave more than three weeks before he filed his CHRO and EEOC complaints. (ECF No. 23 at 4.)

The defendants' argument fails, however, because the plaintiff did not suffer any adverse employment actions before he engaged in a protected activity. Placement of an employee on administrative leave with pay during the pendency of an investigation does not constitute an adverse employment action. *Joseph v. Leavitt*, 465 F.3d 87, 91 (2d Cir. 2006). In *Slattery*, the court determined that the plaintiff had suffered a series of adverse employment actions, including being placed on probation and having his job responsibilities diminished, prior to participating in a protected activity. *Slattery*, 248 F.3d at 89. These adverse employment actions coupled with plaintiff's eventual termination qualified as "an extensive period of progressive discipline." *Id.* at 90. Conversely, the plaintiff in the present case did not experience an extensive period of progressive discipline. The plaintiff here suffered from only one adverse employment action—a demotion—and it occurred after the plaintiff had filed his EEOC and CHRO complaints. (ECF No. 17 at ¶ 31.)

The allegations concerning the timing of the protected activity and the adverse employment action are sufficient to allege causation here. Where the plaintiff alleges a causal connection through temporal proximity, as in this case, the proximity in time must be "very close." *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001). Although there is no bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the protected activity and an allegedly retaliatory action, *Shah v. Tunxis Cmty College*, No. 3:14-cv-00712, 2015 WL 4254909 at *8 (D. Conn. 2015), the

Second Circuit has found that seven months is "not prohibitively remote" to find a causal relationship, *Summa v. Hofstra Univ.*, 708 F.3d 115, 128 (2d Cir. 2013).

The plaintiff has alleged that on March 22, 2013, he was placed on paid administrative leave. (ECF No. 17, ¶ 7.) In response, he filed complaints with the CHRO and EEOC on April 15, 2013. (*Id.* at ¶ 31.) On July 26, 2013 the plaintiff was transferred and demoted to Kingsbury Elementary School, to the position of assistant principal. (*Id.* at ¶ 21.) This sequence of events occurred in a span of just over four months. More precisely, only three months and eleven days, *see* (*id.* at ¶ 31); *see also* (*id.* at ¶ 21), elapsed between the participation in a protected activity and the adverse employment action, which is well within the seven months the Second Circuit has allowed. *Summa*, 708 F.3d at 128.

For these reasons, the defendants' Motion to Dismiss is denied with respect to Count Three.

### C.      Count Four: Defamation Claim Against the Board and Superintendent

The defendant's Motion to Dismiss is granted with respect to Count Four because the plaintiff has not alleged that the defendants made any false statements. To establish defamation under Connecticut law, the plaintiff must demonstrate that "(1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement." *Hopkins v. O'Connor*, 282 Conn. 821, 838 (2007).

The defendants argue that: (1) the plaintiff has not alleged specific facts to support a defamation claim; (2) the plaintiff has failed to plead any false statements; and (3) as a public figure, the plaintiff has failed to plead the additional element of actual malice. Because I agree with the second argument, I need not address the others.

Under Connecticut law, "the truth of an allegedly libelous statement of fact provides an absolute defense" to a defamation claim. *Goodrich v. Waterbury Republican-Am., Inc.*, 188 Conn. 107, 112 (1982). Although truth is an affirmative defense in a libel case, *Gambardella v. Apple Health Care, Inc.*, 86 Conn. App. 842, 851, affirmative defenses may be raised in a pre-answer Rule 12(b)(6) motion "if the defense appears on the face of the complaint." *Iowa Pub. Emps. Ret. Sys. v. MF Global, Ltd.*, 620 F.3d 137, 145 (2d Cir. 2010). Because the complaint pleads facts showing that the allegedly defamatory statements were true, I may address this issue on the defendants' Rule 12(b)(6) motion.

According to the plaintiff, the defendants "provided and published intimate details of Brown's placement on administrative leave," (ECF No. 17 at 16, ¶ 34), and stated that the plaintiff was "*accused* of singling people out, and chastising them in front of the group if they weren't participating in an activity," (*id*. at 16, ¶ 35) (emphasis added). Neither of the two statements attributed to the defendants are alleged to be false. The plaintiff concedes that he was placed on paid administrative leave. (*Id*. at ¶ 7.) Moreover, the plaintiff concedes that he was *accused* of creating an environment of fear and intimidation at Walsh in a state audit report. (*Id*. at ¶ 8.) It is not false to say that the plaintiff was *accused* of chastising and bullying his staff because the plaintiff admits that he was accused of such misconduct. (*Id*.) The plaintiff also argues that the defendants falsely stated that the plaintiff "*chastised and bullied* teachers, as well as other stuff." (ECF No. 22 at 10) (emphasis added). But this is not what the plaintiff alleged in his complaint. The Amended Complaint alleges only that the defendants informed NBC30 that the plaintiff was "*accused* of singling people out, and chastising them in front of the group if they weren't participating in an activity," (ECF No. 17 at 16, ¶ 35) (emphasis added). Again, this statement is not false.

Because the facts alleged show that the published statements at issue were true, the defendant's Motion to Dismiss is granted with respect to Count Four of the plaintiff's Amended Complaint.

> **D.    Count Five: Intentional Infliction of Emotional Distress Claim Against the Board and the Superintendent.**

To state a claim for intentional infliction of emotional distress ("IIED"), a plaintiff must allege "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." *Appleton v. Bd of Educ. of Town of Stonington*, 254 Conn. 205, 210 (2000). Here, the plaintiff has failed to allege that the defendants' behavior was extreme and outrageous.

Extreme and outrageous conduct is conduct "that exceeds all bounds usually tolerated by decent society," and does not include "[c]onduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings." *Id.* In the employment context, "courts have commonly held that hostile and demeaning conduct, including harassment in the workplace, does not rise to the level of extreme and outrageous conduct." *Guerrera v. Cunningham*, No. CV085003151S, 2015 WL 1727584 at *5 (Conn. Super. Ct. March 17, 2015).

The plaintiff argues that the defendants' conduct, specifically the leaking of "intimate details"[4] regarding the plaintiff's employment situation, constituted conduct so outrageous in character as to go beyond all possible bounds of decency. (ECF No. 22 at 12.) According to the plaintiff, the defendants' actions caused him "severe emotional distress and trauma,

---

[4] The Amended Complaint does not state what these "intimate details" included, only that they were details surrounding the plaintiff's placement on administrative leave, his subsequent demotion, and the state audit report accusations. (ECF No. 17 at 17, ¶ 35.)

sleeplessness, loss of appetite, loss of his employment, overly burdensome financial hardships, damage to his relationship with his family and friends, as well as damage to his self-esteem [and] sense of self-worth." (ECF No. 17 at 17, ¶ 36.) The plaintiff further contends that the defendants released intimate details regarding the plaintiff's employment situation "with the specific and vindictive intent of causing the plaintiff severe emotional distress." (ECF No. 22 at 12.)

A review of pertinent Connecticut cases addressing IIED claims shows that even when all of the allegations in the plaintiff's Amended Complaint are taken as true, the defendants' conduct was not "extreme and outrageous." In *Appleton*, a teacher filed an IIED claim against her employer after the employer (1) subjected the teacher to psychiatric examinations; (2) personally contacted the teacher's family; (3) had the teacher escorted out of the school by police; (4) and eventually forced the teacher to resign. *Appleton*, 254 Conn. at 211. The Connecticut Supreme Court held that the defendants' conduct was "insufficient to form the basis of an action for [IIED]," because the defendants' actions "were not so atrocious as to exceed all bounds of decent society." *Id*. at 212.

In *Dollard v. Board of Educ. of Town of Orange*, 63 Conn. App. 550, 555 (2001), the court held that the conduct of two supervisors, who planned to systematically force a school psychologist to resign from her position, was no more extreme and outrageous than the conduct displayed in *Appleton*. The two supervisors in *Dollard* transferred the psychologist to a school where she did not want to be assigned, and publicly admonished the psychologist for chewing gum, being late, and not using her time well. *Id*. at 552-53. In *Dollard*, the court held that transferring an employee to another school does not constitute extreme and outrageous conduct, even when done with intent to make the employee "so distraught that [the employer] would have a . . . basis for terminating her employment." *Dollard* 63 Conn. App. at 552. This case is similar:

the plaintiff also alleges that he was publicly admonished and criticized when information regarding his employment situation, including his transfer to another school, was released to the public. (ECF No. 17 at 17, ¶ 35). These allegations are "insufficient to form the basis of an action for [IIED]." *Dollard,* 63 Conn. App. at 555.

The plaintiff's IIED claim also relies on the allegation that the defendants released "intimate details" concerning his employment situation to the media. (ECF No. 17 at 17, ¶ 35.) The plaintiff fails to allege with any specificity what these "intimate details" were (*id.*), but he does argue that the details were "held out to be confidential," (ECF No. 22 at 11), and that their release was in "complete violation of his privacy interests." (ECF No. 17 at ¶ 22.) But the release of confidential information is not, on its own, a sufficient basis for an IIED claim either. This Court stated in *Russo v. City of Hartford*, 158 F. Supp. 2d 214, 226 (D. Conn. 2001) that even the disclosure of confidential information does not alone constitute extreme and outrageous conduct. The plaintiff in *Russo*, a Hartford police detective, was forced to submit to a drug test as part of a criminal investigation into his alleged drug use. *Id.* at 220. His employer then revealed information about the drug test to departmental personnel and others, including a newspaper reporter, which caused the detective to suffer severe emotional distress. *Id.* at 221. The detective filed a claim for IIED arguing that the disclosure of confidential information, specifically his drug test results, constituted extreme and outrageous conduct. *Id.* at 226. The Court dismissed the claim stating that the alleged invasion of privacy, without more, was insufficient to support an IIED claim. *Id.* Especially given the lack of specificity of this claim, it is insufficient to support an IIED claim even when combined with the allegations about the public criticism of his job performance.

14

Finally, the plaintiff argues that the defendants intended to inflict emotional distress upon the plaintiff when they demoted him "in total disregard of his contractual and civil rights," (ECF No. 17 at 17, ¶ 34), but an "employer's adverse yet routine employment action does not constitute extreme and outrageous conduct even if based on race or other improper motives." *Robinson v. City of New Haven*, 578 F. Supp. 2d 385, 390 (D. Conn. 2008).

Therefore, the defendants' Motion to Dismiss is granted with respect to Count Five of the plaintiff's Amended Complaint.

###    E.    Count Three (A): Due Process Claim Against the Superintendent in Her Individual Capacity.

The right to procedural due process stems from the Fourteenth Amendment, which provides that no person shall be deprived of "life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, § 1. This protection extends to a "property interest in a particular position or rank," *Ciambriello v. County of Nassau*, 292 F.3d 307, 318 (2d Cir. 2002), if that interest derives from a source independent of the Constitution, such as state law. *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972).

In order to prevail on his due process claim, the "plaintiff must prove that: (1) he has been deprived of a property interest cognizable under the due process clause; and (2) the deprivation of the property interest has occurred without due process of law." *Tedesco v. City of Stamford*, 222 Conn. 233, 241 (1992). If the plaintiff alleges that he had a legitimate claim of entitlement to a protected property interest, then due process requires that the employee be afforded a pre-deprivation opportunity to respond to the charges against him and a post-deprivation administrative procedure. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 547–48 (1985). The defendants' Motion to Dismiss is denied with respect to Count Three (A) because

15

the plaintiff has alleged that the procedures attendant upon the deprivation of his property interest were constitutionally insufficient.

The plaintiff alleges that he had a property interest in his employment at Walsh because he qualified as a "permanent employee" of the State of Connecticut. (ECF No. 17 at 11, ¶ 33.) Under Connecticut law, a permanent employee is "an employee holding a position in the classified service under a permanent appointment or an employee holding a position in unclassified service who has served in such a position for a period of more than six months." Conn. Gen. Stat. § 5-196(19). The plaintiff qualifies as an employee holding a position in the classified service because Conn. Gen. Stat. § 5-197 defines a classified employee as one who is in "any office or position in the state service, whether full-time or part-time."

Classified service employees may not be dismissed without cause if they perform their duties in a satisfactory manner. Conn. Gen. Stat. § 5-240(c). "It is thus recognized that classified civil service employees in Connecticut have a property right in continued employment which is protected by the due process clause of the fourteenth amendment." *Mancuso v. Dunbar*, No. 08-cv-1018, 2010 WL 466004 at *5 (D. Conn. 2010) (quoting *King v. Lesnick*, 720 F. Supp. 236, 239 (D. Conn. 1989). The plaintiff, as a classified civil service employee, had a property right in his position at Walsh.

Once a court has established that a plaintiff possessed a property interest in continued employment, it must "analyze whether the plaintiff has been deprived of that interest without the constitutional minimum due process to which he is entitled." *Id*. The Supreme Court in *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 547–48 (1985), held that due process requires that an employee with a property right in continued employment be afforded a pre-deprivation opportunity to respond to the charges against him coupled with a post-deprivation

administrative procedure. The plaintiff here has alleged that he was not afforded an opportunity to respond to the charges against him before being deprived of his property interest.

The plaintiff relies heavily on *Ciambriello v. County of Nassau*, 292 F.3d 307 (2d Cir. 2002), which held that a public employee's demotion, without prior notice and an opportunity to be heard, violated the employee's procedural due process rights. Similarly, the plaintiff in this case alleges that his procedural due process rights were violated when he was demoted "without a prior formal or informal hearing or mechanism." (ECF No. 17 at 12, ¶ 37.)

Defendants argue that the plaintiff has failed to plead that his demotion was part of the deprivation. They point to the following allegation: "At this time, Ouellette removed Brown from his Principalship at Walsh, and demoted him to the position of Vice Principal at Kingsbury Elementary School without a prior formal or informal hearing or mechanism to challenge his placement on administrative leave." (*Id.* at 12, ¶ 37.) The defendants emphasize the end of the quoted sentence and argue that the plaintiff is alleging only that he was placed on administrative leave without a mechanism to challenge the decision. (ECF No. 23 at 8.) A liberal reading of the sentence in a light most favorable to the plaintiff, however, would permit the inference that the plaintiff is also alleging that he was demoted without a prior hearing or mechanism to challenge the demotion.

Because the plaintiff has alleged that he has been deprived of a property interest cognizable under the due process clause, and that the deprivation occurred without due process of law, the defendants' Motion to Dismiss in regards to Count Three (A) is denied.

## IV.   Conclusion

For the reasons discussed above, the defendants' Motion to Dismiss is GRANTED IN PART and DENIED IN PART. The Motion to Dismiss is granted as to Counts Four and Five for

17

failing to state a claim upon which relief can be granted. The Motion to Dismiss is denied as to Counts Two, Three, and Three (A) because the Plaintiff has sufficiently pled nonconclusory factual allegations in his Amended Complaint. Counts One, Two, Three, and Three (A) of the Amended Complaint remain.

IT IS SO ORDERED.

/s/
Michael P. Shea, U.S.D.J.

Dated:        Hartford, Connecticut
              March 11, 2016