UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ERIK BROWN,<br>          Plaintiff,<br>          v.<br>WATERBURY BOARD OF<br>EDUCATION and DR. KATHLEEN<br>OUELLETTE, in her individual capacity,<br>          Defendants. | No. 3:15-cv-00460 (MPS) |

## MEMORANDUM OF DECISION

Erik Brown asserts that the Waterbury Board of Education ("Board") and its superintendent, Dr. Kathleen Ouellette, demoted him from his position as principal of Walsh Elementary School because he is African American. His amended complaint alleges race discrimination, including discriminatory demotion and a hostile work environment, against the Board (Count One, under Title VII of the Civil Rights Act of 1964) and against Ouellette (Count Two, under 42 U.S.C. §§ 1981 and 1983), retaliation in violation of the First Amendment, the Connecticut Constitution, and Title VII against the Board (Count Three), and a violation of his right to procedural due process under the Fourteenth Amendment against Ouellette (Count Three (A) under 42 U.S.C. § 1983). [1]

Defendants move for summary judgment as to all of Brown's claims, contending principally that the undisputed evidence in the record shows that the demotion stemmed from reports of Brown's own poor performance corroborated by an independent investigation. Their motion is GRANTED IN PART and DENIED IN PART. Defendants are entitled to summary judgment on Brown's Title VII hostile work environment claim in Counts One and Two, his

---

[1] Brown did not change the numbering of the claims in his amended complaint when he added his procedural due process claim. Therefore, I refer to the retaliation claim as "Count Three" and the due process claim as "Count Three (A)."

procedural due process claim in Count Three (A), and his retaliation claim under the First Amendment in Count Three because Brown has failed to submit evidence raising a genuine issue of material fact on those claims.  Brown's retaliation claim under the Connecticut Constitution in Count Three is dismissed without prejudice under 28 U.S.C. § 1367(c)(1).  Genuine issues of material fact about whether Brown's race or his complaints to anti-discrimination agencies contributed to his demotion preclude summary judgment as to the Title VII discriminatory demotion claim in Counts One and Two and the Title VII retaliation claim in Count Three.

## I.    Background

The following facts are taken from the parties' Local Rule 56(a) Statements and the documents cited therein.  *See* Defendants' Local Rule 56(a)(1) Statement, ECF No. 40 ("Def.'s LRS"); Plaintiff's Local Rule 56(a)(2) Statement, ECF No. 44-1 ("Pl.'s LRS").  The facts are undisputed unless otherwise stated.

### A.    Brown's Placement on Administrative Leave and Demotion

On August 18, 2005, the Board hired Brown – an African American – as principal of Walsh Elementary School ("Walsh").  (Def.'s LRS ¶ 2; Pl.'s LRS ¶ 2.)  Though Walsh was "deteriorating," in a blighted neighborhood, and one of the lowest-performing schools academically in the state, Brown was "motivated" to accept the challenge.  (ECF No. 44-4 at 43.)  Over the next eight years, Brown served as principal of Walsh, but Walsh struggled to improve on standardized performance tests.  (Def.'s LRS ¶ 3; Pl.'s LRS ¶ 3.)

Walsh's stagnant academic performance made Walsh eligible for designation as a "Commissioner's Network School," which is also referred to as a "Turnaround School." (Def.'s LRS ¶ 4; Pl.'s LRS ¶ 4.)  The Commissioner's Network "provide[s] resources and flexibilities to improve student achievement in the state's lowest performance schools. The [program] is designed

as a partnership between local stakeholders and the state." (ECF No. 41-1 at 4.)  Brown and Ouellette submitted an application to the Connecticut Department of Education to designate Walsh a Turnaround School.  (Def.'s LRS ¶ 5; Pl.'s LRS ¶ 5.)  As part of the application process, the Connecticut Department of Education required an audit of Walsh by state officials.  (Def.'s LRS ¶ 6; Pl.'s LRS ¶ 6.)  On February 27 and 28, 2013, state officials audited Walsh. (Def.'s LRS ¶ 7; Pl.'s LRS ¶ 7.)  In March 2013, the state officials issued a report of their audit entitled "The Commissioner's Network Operations and Instructional Audit Report, Walsh School" (the "Audit Report").  (Def.'s LRS ¶ 7; Pl.'s LRS ¶ 7.)  The Audit Report identified concerns relating to Walsh's administration.  (Def.'s LRS ¶ 8; Pl.'s LRS ¶ 8.)  Specifically, the Audit Report found that there was an "atmosphere of fear and intimidation" at Walsh.  (ECF No. 41-1 at 7.)  It noted "staff reports that school leadership ha[d] threatened retribution if [staff] do not support its decisions."  (*Id*.)  But it mentioned no specific incidents of bullying or intimidation by Walsh's administrative team, which included Brown and the vice principal, Maria Zillo.  (*Id*.)

Following the Audit Report's issuance, the Waterbury Teacher's Association, along with Walsh teachers, invited Ouellette to discuss their concerns about Brown's management and administration of Walsh.  (Def.'s LRS ¶ 9; Pl.'s LRS ¶ 9.)  In the meeting, Walsh staff expressed their view that "the building administrators at Walsh (Principal Erik Brown and Assistant Principal Maria Zillo) had created an atmosphere of intimidation in the school." (ECF No. 41-2 at 3.)  Brown had no notice of the meeting between members of his staff and Ouellette and did not attend.  (ECF No. 44-4 at 121.)  No grievances (concerning bullying or otherwise) had ever been filed against Brown.  (ECF No. 44-5 at 27.)

After her meeting with Walsh staff, Ouellette took two steps.  First, on March 22, 2013, Ouellette placed Brown and Zillo (a white woman) on administrative leave, a status in which they

continued to receive their full salaries and benefits.  (Def.'s LRS ¶ 14; Pl.'s LRS ¶ 14.)  According to Ouellette, she decided to place Brown and Zillo on administrative leave pending an independent investigation into the allegations set forth in the Audit Report.  (ECF No. 41-7 at ¶¶ 13-15.)  She decided that a more "fair[] and impartial[]" investigation could be conducted with Brown and Zillo on administrative leave.  (*Id*. at ¶ 13.)  Ouellette did not provide Brown any opportunity before he was placed on administrative leave to address or correct any of the alleged deficiencies raised in the Audit Report.  (ECF No. 44-4 at 161); *see also* (ECF No. 41-6 at 22)("Mr. Brown was given no opportunity to correct any deficiencies.")  Second, on March 25, 2013, Ouellette hired Attorney Frederick L. Dorsey to conduct an independent investigation into the issues raised in the Audit Report.  (Def.'s LRS ¶ 11; Pl.'s LRS ¶ 11.)

While on administrative leave, Brown received a copy of the Audit Report.  (Def.'s LRS ¶ 21; Pl.'s LRS ¶ 21.)  On April 15, 2013, he filed complaints with the Connecticut Commission on Human Rights and Opportunities ("CHRO") and the United States Equal Employment Opportunities Commission ("EEOC") alleging discrimination by the Defendants on account of his race.  (Def.'s LRS ¶ 21; Pl.'s LRS ¶ 21.)

On June 7, 2013, Dorsey issued his report – entitled "Investigative Report for the Waterbury Board of Education, Allegations Regarding Administrative Improprieties at Walsh Elementary School" (the "Dorsey Report") – detailing the findings of his investigation.  (Def.'s LRS ¶ 15; Pl.'s LRS ¶ 15.)  The Dorsey Report concluded that "during the time Mr. Brown has been Principal of Walsh, educational leadership has been poor, decision-making suspect and the staff demoralized.  It is highly unlikely that returning the current administrative staff to Walsh will result in a successful turnaround of that school."  (ECF No. 41-2 at 18.)  The Dorsey Report, like the Audit Report, did not recount specific instances of bullying and intimidation by Brown.

4

On July 23, 2013, following a review of the Dorsey Report, Ouellette advised Brown that she was "considering reassigning [him] to a position other than elementary school principal." (ECF No. 41-3 at 2.)  She indicated that she was contemplating the change based on the Audit Report's conclusion "that there were significant problems with administrative leadership at Walsh" and the Dorsey Report's conclusion "that there were substantial problems with [Brown's] leadership at Walsh." (*Id.*)  Ouellette invited him to a meeting to discuss the change.  (Def.'s LRS ¶ 17; Pl.'s LRS ¶ 17.)  After the meeting, Ouellette demoted Brown to vice principal and transferred him to Kingsbury Elementary School.  (ECF No. 41-7 at ¶ 19.)  According to Ouellette, she made her decision "[b]ased upon the Audit Report, the Dorsey Report, the information given to [her] at [her] meeting with members of the Waterbury Teachers Union, and Mr. Brown's unwillingness to accept any responsibility for the issues raised in the Audit and Dorsey Reports." (*Id.*)

### B.  The Arbitration Award

On August 19, 2013, Brown filed a grievance concerning his demotion and transfer under the collective bargaining agreement with the Board.  (ECF No. 41-6 at 10.)  On October 8, 2015, following a lengthy arbitration process, the arbitration panel issued an award in favor of Brown, finding that the Board had "violated the [collective bargaining] [a]greement when it reassigned Mr. Brown to the position of Supervising Vice Principal." (*Id.* at 25.)  Specifically, the arbitration panel concluded that the Board did not have "just cause" to demote Brown, because it relied on anonymous reports by staff (*Id.* at 23)(citing the "lack of direct testimony that served as the basis for the demotion") and "made no efforts…to indicate what corrective actions were necessary…" (*Id.*)  The panel also concluded that "[t]he Board failed to follow an important procedural aspect of the evaluation protocol" by failing to give Brown an opportunity to address "perceived deficiencies." (*Id.* at 30.)  The panel ordered that Brown "be reinstated to the rank of Elementary

School Principal," and "receive back pay as an Elementary School Principal for the period of his demotion together with all contractually agreed upon benefits to which he is entitled." (*Id*. at 31.) The arbitration award did not "require[] or direct[] the Waterbury Board of Education to assign Mr. Brown to Walsh Elementary School." (*Id*.) Following the arbitration award, Brown was reinstated as a principal at another school in the Waterbury School system. (Def.'s LRS ¶ 22; Pl.'s LRS ¶ 22.)

### C.   Brown's Comparators

Brown claims his treatment by the Defendants was discriminatory because white elementary school administrators alleged to have engaged in similar conduct (intimidation and bullying) were treated differently than he. (ECF No. 44 at 16-20.) He identities five comparators: Anne Begley, Noreen Buckley, Buerkle, Maria Moulthrop, and Maria Zillo. (*Id*.) The alleged conduct concerning Begley, Buerkle, and Moulthrop occurred during the tenure of Dr. David Snead (an African-American), who preceded Ouellette as superintendent of Waterbury Schools.[2] (Def.'s LRS ¶¶ 35, 39; Pl.'s LRS ¶¶ 35, 39); *see also* (ECF No. 44-5 at 116-19.) The alleged conduct concerning Buckley and Zillo occurred during Ouellette's tenure. (Def.'s LRS ¶¶ 51-52 ; Pl.'s LRS ¶¶ 51-52.)

   1.   Anne Begley

In January or February 2008, Bucks Hill Elementary staff and teachers claimed Anne Begley – the white principal at the school – was ignoring teacher requests and engaging in threatening and verbally abusive conduct. (Def.'s LRS ¶ 38; Pl.'s LRS ¶ 38.) Following an investigation, Dr. Snead assigned Begley a mentorship team to work with her weekly and advise

---

[2] Dr. David Snead was the Superintendent of Waterbury Schools from August 1, 2000 through October 31, 2011. (ECF No. 41-7 at ¶ 2.) Ouellette succeeded him as Superintendent of Waterbury schools on November 1, 2011. (*Id*. at ¶ 1.)

her how to improve her management style.  (Def.'s LRS ¶ 40; Pl.'s LRS ¶ 40.)  She was never placed on administrative leave.  (Def.'s LRS ¶ 40; Pl.'s LRS ¶ 40.)

        2.     Noreen Buckley

In 2014, Buckley – the white principal of Regan Elementary School – had an anonymous complaint filed against her by teachers accusing her of intimidation and bullying.  (Def.'s LRS ¶ 46; Pl.'s LRS ¶ 46.)  The complaint was sent to Kevin Egan, the Waterbury Teachers Association President.  (Def.'s LRS ¶ 50; Pl.'s LRS ¶ 50.)  Egan did not file a grievance against Buckley because an anonymous complaint could not be pursued under the terms of the collective bargaining agreement in effect at that time.  (Def.'s LRS ¶ 50; Pl.'s LRS ¶ 50.)  Ouellette did not order an independent investigation into the allegations and Buckley was neither placed on administrative leave nor demoted.  (ECF No. 41-7 at ¶ 40.)

        3.     Buerkle[3]

Buerkle, who is white, served as principal at the State Street School during Dr. Snead's tenure.  (ECF No. 44-5 at 117.)  While she was principal at State Street, staff made allegations that she had intimidated and bullied them.  (*Id.*)  The Board provided her professional development resources, including mentoring.  (*Id*)  She was never demoted or placed on administrative leave on account of those allegations.  (*Id.*)

        4.     Maria Moulthrop

When Dr. Snead was superintendent, Maria Moulthrop (who is white) was principal of Hopeville Elementary School.  (Def.'s LRS ¶ 28, 32; Pl.'s LRS ¶ 28, 32.)  She was accused of engaging in improper testing procedures when administering a standardized test.  (Def.'s LRS ¶ 29; Pl.'s LRS ¶ 29.)  Attorney Dorsey was hired to conduct the investigation into Moulthrop's

---

[3] I was unable to locate Buerkle's first name in the record.

alleged misconduct.  (Def.'s LRS ¶ 30; Pl.'s LRS ¶ 30.)  Moulthrop was placed on paid administrative leave during Dorsey's investigation.  (Def.'s LRS ¶ 33; Pl.'s LRS ¶ 33.)  During Dorsey's investigation, Moulthrop was provided the identity of her accusers.  (ECF No. 44-4 at 143-46).  She subsequently resigned her position.  (Def.'s LRS ¶ 34; Pl.'s LRS ¶ 34.)

        5.    Maria Zillo

Zillo was accused of intimidation and bullying by Walsh staff, as reflected in the Dorsey and Audit Reports.  (ECF No 41-2 at 5); *see also* (ECF No. 41-1 at 10.)  She was placed on administrative leave but never demoted.

## II.    Legal Standard

Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The "party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists." *Goenaga v. Mar. of Dimes Birth Defects Found*, 51 F.3d 14, 18 (2d Cir. 1995).  "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Id.* If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact."  *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). An issue of fact is "material" if it "might affect the outcome of the suit under the governing law." *Konikoff v. Prudential Ins. Co. of America*, 234 F.3d 92, 97 (2d Cir. 2000)(citation and quotation marks omitted).  "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006)(citation and quotation marks omitted).

On summary judgment, I must "construe the facts in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013)(citation and quotation marks omitted).

## III.     Discussion

### A.     Brown's Claims Are Not Moot

Defendants argue that all of Brown's claims are moot because the arbitration award provides him with all the relief he seeks.  (ECF No. 41 at 5-6.)  "It is well established that the Case or Controversy Clause of Article III, Section 2 of the United States Constitution limits the subject matter jurisdiction of the federal courts such that the parties must continue to have a personal stake in the outcome of the lawsuit.  That is, when the issues in dispute between the parties are no longer live, a case becomes moot."  *Tanasi v. New All. Bank*, 786 F.3d 195, 198 (2d Cir. 2015)(internal quotation marks, alterations, and citations omitted).

#### 1.     Title VII Claims

Under Title VII, attorneys' fees and punitive damages are available.  The amended complaint seeks "[a]ttorney's fees and the reimbursement of costs of the instant action" and "[p]unitive damages in an amount th[e] Court shall consider just and fair."  (ECF No. 17 at 18.) The arbitration award does not provide for punitive damages or legal fees incurred by Brown. (ECF No. 41-6 at 31.)  If Brown is successful on his Title VII claims, he could be awarded such damages.  Therefore, because the arbitration award does not provide for all the relief to which Brown is legally entitled under Title VII, Brown's Title VII claims are not moot.  *See e.g.*, *Schooler v. Allied Tube & Conduit Corp.*, No. 98 C 7962, 2001 WL 12012, at *8 (N.D. Ill. Jan. 4, 2001)("[Plaintiff] is also entitled under Title VII to prejudgment interest and punitive damages

in addition to her lost overtime, back pay, and bonuses. The Court agrees with Schooler that reinstatement, overtime, and back pay do not constitute 'all of the requested relief to which [Plaintiff] is legally entitled.'"); *Eason v. Del Monto Foods*, No. CIV.A.04-1698, 2006 WL 2645146, at *8 (W.D. Pa. Sept. 14, 2006)("Defendant also argues that because it made Plaintiff whole, her compensation claims are moot. Not so, because, for example, punitive damages are available under Title VII.").

2.      Sections 1981 and 1983 Claims

Similarly, Brown's sections 1981 and 1983 claims are not moot because he may – if he prevails – recover punitive damages and/or attorneys' fees.  The arbitration award does not encompass such relief.  Therefore, Brown's claims are not moot.  *See  62-64 Kenyon St. Hartford, LLC  v.  City  of  Hartford*, No. 3:16-CV-00617, 2017 WL 20911, at *5 (D. Conn. Jan. 2, 2017)(noting under Second Circuit precedent that a defendant's potential liability for attorneys' fees prevented a case from becoming moot).

**B.      Counts One and Two: Title VII and Sections 1981 and 1983 Claims**

Brown asserts claims under Title VII and sections 1981 and 1983 based on theories of discriminatory demotion and hostile work environment.  In this case, Title VII and Sections 1981 and 1983 impose the same legal standards and the claims will thus be analyzed together.[4]  "A

---

[4] *See, e.g.*, *Men of Color Helping All Soc., Inc. v. City of Buffalo*, 529 F. App'x 20, 26 (2d Cir. 2013)("Race discrimination claims under Title VII, NYHRL, and §§ 1981 and 1983 are analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green…*"). While there are distinctions between the claims, they are not relevant here.  *See Jackson v. City of N.Y.*, 29 F. Supp. 3d 161, 170 (E.D.N.Y. 2014)("The primary doctrinal differences between Title VII claims and employment discrimination claims pursuant to Sections 1981 and 1983 regard (1) the statute of limitations, (2) the requirement that Section 1981 or 1983 plaintiffs must show employment discrimination pursuant to an official policy or custom, (3) that individuals may be held liable under Sections 1981 and 1983, but not under Title VII, and (4) a Title VII claim may be established through proof of negligence, whereas Section 1981 and 1983 claims must be supported by evidence of intentional discrimination."(internal quotation marks and citation omitted)). In this

plaintiff may establish a claim of disparate treatment under Title VII either (1) by showing that

he has suffered an adverse job action under circumstances giving rise to an inference of

discrimination on the basis of race, color, religion, sex, or national origin, or (2) by

demonstrating that harassment on one or more of these bases amounted to a hostile work

environment."  *Feingold v. New York*, 366 F.3d 138, 149 (2d Cir. 2004)(internal quotation marks

and citation omitted).  The same is true of disparate treatment claims under sections 1981

and 1983.  *Demoret v. Zegarelli,* 451 F.3d 140, 149 (2d Cir. 2006)("[Section] 1983 and the Equal

Protection Clause protect public employees from various forms of discrimination, including

hostile work environment and disparate treatment....Once action under color of state law is

established, the analysis for such claims is similar to that used for employment discrimination

claims brought under Title VII."); *Patterson v. Cty. of Oneida, N.Y.,* 375 F.3d 206, 226 (2d Cir.

2004)(observing "individuals may be held liable under §§ 1981 and 1983 for certain types of

discriminatory acts, including those giving rise to a hostile work environment…").  I analyze the

discriminatory demotion and hostile work environment claims below.

                    1.      Discriminatory Demotion

Under the burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green,*

411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), which applies on summary judgment, "a

plaintiff first must establish a *prima facie* case of discrimination based on race.  If he does so, the

burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the

employee's dismissal.  If such a reason is proffered, the burden shifts back to the plaintiff to

---

case, Brown's Title VII discriminatory demotion claim survives only if Ouellette is liable, as
Brown identifies no other Board employee, agent, or supervisor who is alleged to have
discriminated against him.

prove that discrimination was the real reason for the employment action." *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000)(internal quotation marks and citations omitted). Each component of the framework is analyzed below.

a. Prima Facie Case

To establish a *prima facie* discriminatory treatment case, a plaintiff must show "1) that he belonged to a protected class; 2) that he was qualified for the position he held; 3) that he suffered an adverse employment action; and 4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Feingold*, 366 F.3d at 152 (citation omitted).

In this case, the parties agree Brown can establish both the first and third elements of a *prima facie* case, but Defendants dispute the remaining elements. As to the second element, however, the evidence suggests that Brown was qualified for the position he held because he was hired for it. *See id.* ("[Plaintiff] undisputedly was qualified for the ALJ position, as he had in fact been hired for that position."). Further, and contrary to Defendants' assertion, the evidence does not "clearly demonstrate[]" that "Brown was not performing his duties satisfactorily." (ECF No. 41 at 23.) Rather, Brown's performance reviews suggest he was performing his job competently during both Snead's and Ouellette's tenures. *See e.g.*, (ECF No. 44-3 at 109)("Comments on Overall Job Performance" indicated Brown "[s]urpassed all expectations for previous objectives. Well matched to Walsh School.");(*Id.* at 119)(Ouellette observed "Mr. Brown creates a framework for collaborative work with his staff by school-wide data analysis. He has led his staff to reflect on key and essential questions" and that "[s]chool climate improvements have been sustained due to [Brown's] personal commitment to Walsh."). Ouellette testified that from 2011, when she started, until the Audit Report, she had no concerns

with Brown's performance.  (ECF No. 44-5 at 15-16.)  Furthermore, she testified that no

grievances were filed against Brown.  (*Id*. at 27.)  In an evaluation, she stated, "Brown create[d] a

framework for collaborative work with his staff" and that "[s]chool climate improvements have

been sustained due to [his] personal commitment to Walsh."  (ECF No. 44-3 at 119.)  Her mid-

year review conducted in January 2013, though reflecting some concerns, did not suggest Brown

would be transferred or demoted on account of his behavior or administrative skills.  (ECF No.

44-5 at 3, 25.)  To be sure, the Audit and Dorsey Reports criticized Brown's performance.  But

the evidence concerning the performance reviews is enough for Brown to meet his "minimal"

burden as to the qualification element.  *See Owens v. New York City Hous. Auth.,* 934 F.2d 405,

409 (2d Cir. 1991)(noting with respect to the second prong, "*McDonnell Douglas* requires only a

minimal showing of qualification to establish a *prima facie* claim" and a plaintiff "only needs to

demonstrate that [ ]he possesses the basic skills necessary for performance of the job")(internal

quotations marks and citations omitted).

        As for the fourth element, Brown offers two reasons why his placement on administrative

leave and demotion occurred under circumstances giving rise to an inference of racial

discrimination: (i) he was replaced as principal of Walsh by a member outside his racial group

and (ii) similarly situated white administrators were treated differently than he following

allegations of intimidation and bullying.  First, Brown has raised an inference of discriminatory

intent because, after his demotion, he was replaced as principal of Walsh by Ellen Paolino, who

is white.  (ECF No. 44-5 at 97.)  *See, e.g.*, *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 135 (2d

Cir. 2000)("[A] plaintiff has demonstrated an inference of age discrimination and thus

established a prima facie case…where the majority of plaintiff's responsibilities were transferred

to a younger person…"); *de la Cruz v. N.Y.C. Human Res. Amdin. Dept. of Social Services*, 82

F.3d 16, 20 (1st Cir. 1996)("As a Puerto Rican, de la Cruz is a member of a protected class. Because de La Cruz was replaced by a black female, he also satisfies the fourth prong of the prima facie case.").

Second, there is evidence that Brown was treated less favorably than similarly situated employees outside his protected group, which also may be a basis for drawing an inference of discriminatory intent.  To be similarly situated the individuals with whom the plaintiff attempts to compare himself must be similarly situated "in all material respects."  *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997).  What constitutes "all material respects" is based on "(1) whether the plaintiff and those he maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness....Hence, the standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than showing that both cases are identical."  *Graham*, 230 F.3d at 40 (internal citations omitted).  Whether a plaintiff is similarly situated to comparators is generally a question for the jury.  *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 791 (2d Cir. 2007).  But a "court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met."  *Id*. (internal quotation marks and citation omitted.)

Brown identifies five comparators: Begley, Buckley, Buerkle, Moulthrop, and Zillo. (ECF No. 44 at 16-20.)  According to Brown, each of these administrators – all white administrators in the Waterbury public school system – faced bullying and intimidation allegations by staff, but unlike him, none were demoted.  Further, in contrast to the anonymous complaints against Brown, in the only other case in which an independent investigation was undertaken, the accused was provided with the identity of the accuser.  (*Id*.)

14

i.    Begley, Buerkle, and Moulthrop

Presumably, because Brown and the comparators all worked for the Board, they were all subject to the same general workplace standards.  However, Begley, Buerkle, and Moulthrop had a different supervisor than Brown.  Indeed, Ouellette was not even an employee of the Waterbury School system during the investigations into Begley's, Buerkle's, and Moulthrop's alleged intimidation and bullying.  (ECF No. 41-7 at ¶¶ 1, 2, 27.)  "In the Second Circuit, whether or not co-employees report to the same supervisor is an important factor in determining whether two employees are subject to the same workplace standards for purposes of finding them similarly situated." *Diggs v. Niagara Mohawk Power Corp.*, No. 114CV244GLSCFH, 2016 WL 1465402, at *4 (N.D.N.Y. Apr. 14, 2016)(internal quotation marks and citation omitted)(citing cases).  Courts have held that where employees are disciplined by different supervisors, they are not similarly situated.  *See McDowell v. T-Mobile USA, Inc.*, No. CV-04-2909, 2007 WL 2816194, at *9 (E.D.N.Y. Sept. 26, 2007)(concluding that employees who reported to a different supervisor than plaintiff were not similarly situated, despite the fact that they were subject to the same workplace rules), *aff'd*, 307 Fed.Appx. 531 (2d Cir. 2009); *Gambrell v. Nat'l R.R. Passenger Corp.,* 2003 WL 282182, at *7 n. 12 (S.D.N.Y. Feb. 3, 2003)(finding that when plaintiff reports to "wholly different supervisors" the strength of the inference different treatment raises is "greatly weaken[ed]"); *Conway v. Microsoft Corp.*, 414 F.Supp. 2d 450, 465 (S.D.N.Y. 2006)(finding plaintiff not similarly situated where "[a] different decisionmaker was responsible for investigating and determining how to discipline Ivey with respect to his harassment of Quirke"); *Spiegler v. Israel Disc. Bank of N.Y.*, No. 01 CIV.6364 WK, 2003 WL 21983018, at *2 (S.D.N.Y. Aug. 19, 2003)(finding plaintiff and comparators not similarly situated because there

was no evidence that "[p]laintiff and his comparators dealt with the same supervisor…"); *Diggs*, 2016 WL 1465402 at *4 (concluding that similarly situated prong not met "because [the comparators] were not disciplined by the [same supervisors]…"). Accordingly, Begley, Moulthrop, and Buerkle are not similarly situated to Brown because Snead, rather than Ouellette, was their supervisor.

### ii.   Buckley and Zillo

As for Buckley and Zillo, there is evidence that they are similarly situated because they were subject to the same workplace standards and engaged in comparable conduct. Like Brown, both Buckley and Zillo are (or were) administrators in the Waterbury school system under the supervision of Ouellette. And like Brown, both Buckley and Zillo performed similar work duties, had similar seniority, and had similar accusations leveled against them.[5]   *Simpson v. Metro–North Commuter R.R.,* 2006 WL 2056366, at *24 (S.D.N.Y. July 20, 2006)("[T]o be 'similarly situated,' employees must be substantially similar as to specific work duties, education, seniority, and performance history...").

Both Zillo and Buckley were also accused of engaging in "comparable conduct" to Brown. *Compare* (ECF No. 41-11 at 2 (The complaint filed against Buckley indicated she had "created an atmosphere of bullying and intimidation in the school; there [was] a lack of collaboration between the administration and staff; that [Buckley] excessively micro-manage[d] the school; that there [was] weak instructional guidance or leadership from the administrator; and

---

[5] The fact that Zillo was an assistant principal does not by itself disqualify her as a comparator. *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 109 n. 7 (2d Cir. 2010)("Although an employee's position is relevant to the [similarly situated] analysis, employees need not be of the exact same rank to be considered similarly situated.")(internal quotation marks and citations omitted).

that there [was] mismanagement of staff."); *with* (ECF No. 41-1 at 11)(The Audit Report observed that "there is an atmosphere of fear and intimidation in the school, with the principal repeatedly chastising members of the staff publicly," that "[Brown] has total control over all aspects of the school's program and culture", and that "[s]taff ha[ve] no say in the process and believe[] they must do what they are told")); *see also* (ECF No. 41-2 at 5)(The Dorsey Report noting "the morale at Walsh was depressingly low, that there was little to no confidence in the administration, that teachers felt belittled and afraid of Mr. Brown, and that there was a lack of support from [the] administration, especially Mr. Brown").  The Audit and Dorsey reports leveled the same allegations of intimidation and bullying against Zillo.  (ECF No 41-2 at 3)(The Dorsey Report noting "in March of 2013, the Waterbury Teachers Association, through its union leadership, formally complained to District administrators that the building administrators at Walsh (Principal Erik Brown and Assistant Principal Maria Zillo) had created an atmosphere of intimidation in the school; that there was a lack of collaboration between the administration and staff; that the building administrators excessively micromanaged the school; that there was weak instructional guidance or leadership from administrators; and there was mismanagement of staff and instructional time"); *see also* (ECF No. 41-1 at 10)(The Audit Report describing "[t]he administration is the focus of all decisions and the staff is reluctant to offer suggestions or challenge the decisions that are handed down for fear of retribution.")  Viewing the evidence in the light most favorable to Brown, I find that there is sufficient evidence for a reasonable juror to conclude that Buckley and Zillo were "similarly situated" to Brown.

Defendants contend that Buckley is not "similarly situated" because the collective bargaining agreement between the Board and Waterbury principals in effect at the time of her alleged misconduct prohibited anonymous complaints (like the one filed against her)  from being

pursued under the agreement's grievance provisions.  (Def.'s LRS ¶ 50; Pl.'s LRS ¶ 50.)

Defendants also argue the Board conducted an investigation into the allegations about Buckley

and determined that the "complaints were coming from a few disgruntled teachers and that a

systemic problem relating to the issues raised in [the anonymous] complaint, did not exist."

(ECF No. 41-7 at ¶ 39.)  Brown disputes whether any such investigation occurred, however, and

if the investigation did occur, whether it was as exhaustive as the one into him.  (ECF No. 44-1 at

at ¶ 52.)  But Buckley is similar enough that quibbles over the details in the comparisons

between her and Brown are best left for the jury.  *See McKinney v. Dep't of Transp For Conn.*,

No. 3:06-CV-2055, 2010 WL 1883427, at *5 (D. Conn. May 11, 2010)("While defendants try to

distinguish between the circumstances…, whether…these comparators are similarly situated to

plaintiff is a question best not decided on summary judgment."), *aff'd sub nom. McKinney v.*

*Dep't of Transp., Conn.*, 487 F. App'x 605 (2d Cir. 2012).  Brown has shown that Zillo and

Buckley "have a situation sufficiently similar to [his] to support at least a minimal inference that

the difference of treatment may be attributable to discrimination."  *McGuinness v. Lincoln Hall*,

263 F.3d 49, 54 (2d Cir. 2001).

### b.   Legitimate, Non-Discriminatory Reasons

Because Brown has established a *prima facie* case, the burden shifts to the Defendants to

offer legitimate, non-discriminatory reasons for the adverse employment action, i.e., Brown's

demotion.  "The employer need not persuade the court that it was motivated by the reason it

provides; rather it must simply articulate an explanation that, if true, would connote lawful

behavior."  *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2d Cir. 1998).  The Defendants

contend that Brown's demotion was based upon "the Audit Report, the Dorsey Report, the

information given to [Oullette] at [her] meeting with members of the Waterbury Teachers Union,

and Mr. Brown's unwillingness to accept any responsibility for the issues raised in the Audit and
Dorsey Reports."  (ECF No. 41-7 at ¶ 19.)  Because Defendants have put forth legitimate, non-
discriminatory reasons for demoting Brown, the burden shifts back to Brown to "present
evidence that would permit a rational factfinder to infer that the reasons for his termination were
pretextual."  *Isaac v. City of N.Y.*, 271 F. App'x 60, 63 (2d Cir. 2008).

       c.  Pretext

      In evaluating whether Brown has met his burden with respect to pretext, I must "examine
the record as a whole, just as a jury would, to determine whether a jury could reasonably find an
invidious discriminatory purpose on the part of an employer." *Walsh v. N.Y. City Hous. Auth.*,
828 F.3d 70, 76 (2d Cir. 2016)(quoting *Byrnie v. Town of Cromwell Bd. Of Educ.*, 243 F.3d 93,
102 (2d Cir. 2001)).  At the third stage of the Title VII analysis, "the *McDonnell Douglas*
presumptions disappear from the case, and the governing standard is simply whether the
evidence, taken as a whole, is sufficient to support a reasonable inference that prohibited
discrimination occurred." *James v. New York Racing Ass'n*, 233 F.3d 149, 156 (2d Cir. 2000).  A
plaintiff must present evidence that "the employer's proffered explanations were merely
pretextual and that the actual motivations more likely than not were discriminatory." *Abdu-
Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 469 (2d Cir. 2001). "[T]o defeat summary
judgment within the *McDonnell Douglas* framework...the plaintiff is not required to show that
the employer's proffered reasons were false or played no role in the employment decision, but
only that they were not the only reasons and that the prohibited factor was at least one of the
motivating factors.  Regardless of whether the plaintiff can prove pretext, [] he bears the ultimate
burden of persuasion, and must adduce enough evidence of discrimination so that a rational fact
finder can conclude that the adverse job action was more probably than not caused by

discrimination." *Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 123 (2d Cir. 2004)(internal quotation marks and citations omitted). "To meet his…ultimate burden, the plaintiff may, depending on how strong it is, rely upon the same evidence that comprised her prima facie case, without more." *Id*. at 124 (internal quotation marks and citation omitted). "A showing that similarly situated employees belonging to a different racial group received more favorable treatment can also serve as evidence that the employer's proffered legitimate, non-discriminatory reason for the adverse job action was a pretext for racial discrimination." *Graham*, 230 F.3d at 43. Summary judgment is inappropriate "unless the defendants' proffered nondiscriminatory reason is dispositive and forecloses any issue of material fact." *Id.* at 124.

A jury reviewing the evidence in the record as a whole could reasonably find that racial discrimination by the Defendants was a motivating factor in Brown's demotion. First, "[w]ere a jury to find on these facts that there was disparate treatment in the [Board's] disciplining of [Brown] when compared to [Buckley and Zillo], it could also find that [the Board's] proffer of a non-discriminatory reason for [Brown's demotion] was pretextual." *Graham*, 230 F.3d at 43. This is especially true with regard to Zillo: Although the Audit and Dorsey Reports set forth staff criticism of both of them, and although both were placed on administrative leave, only Brown was demoted. While there may have been legitimate reasons for the distinction – such as that Brown was the focus of the staff criticism – a reasonable juror reviewing the evidence in this record could also find that race was a motivating factor in the different treatment of the two. Second, the evidence that Defendants demoted Brown in violation of the procedures set forth in the collective bargaining agreement and the Board's administrator evaluation protocol, including by failing to afford him an opportunity to correct perceived deficiencies, also suggests discriminatory intent. *Agonafer v. Rubin*, 35 F. Supp.2d 300, 304 (S.D.N.Y. 1998)(evidence of

"clear and deliberate violation of the collective bargaining agreement procedures relating to priority consideration" supported an inference that defendant's proffered reason was mere pretext); *Bagley v. J.P. Morgan Chase & Co.*, No. 10 CIV. 1592, 2012 WL 2866266, at *15 (S.D.N.Y. July 12, 2012)("Although violation of an organization's internal procedures alone is insufficient to create an inference of discrimination or retaliation, failure to follow internal procedures can be evidence of pretext.")(internal quotation marks, alterations, and citations omitted).

Brown has offered evidence from which a reasonable juror could find that the Defendants' proffered reasons were not the only reasons for his demotion, and that race played a role.  Therefore, Brown's discriminatory demotion claim survives summary judgment.

### 2.      Hostile Work Environment Claim

To establish a hostile work environment claim a plaintiff must show that (1) "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment" and (2) "a specific basis exists for imputing the conduct that created the hostile environment to the employer."  *Howley v. Town of Stratford*, 217 F.3d 141, 153-54 (2d Cir. 2000)(internal quotation marks, alterations, and citation omitted).  A plaintiff must also produce evidence that the hostility occurred because of the plaintiff's protected characteristic.  *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2014)("[I]t is axiomatic that mistreatment at work, whether through subjection to a hostile environment or through other means, is actionable under Title VII only when it occurs because of an employee's...*protected characteristic*, such as race or national origin")(internal quotation marks, alterations, and citation omitted)(emphasis in original).

The required showing that "the workplace is permeated" with harassment that "is sufficiently severe" has objective and subjective elements: "the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." *Rogers v. City of New Britain*, 189 F .Supp. 3d 345, 354 (D. Conn. 2016).  In determining whether an environment is "hostile" or "abusive," courts may consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance….[but] no single factor is required." *Howley*, 217 F.3d at 154 (internal quotation marks and citation omitted).  "Usually, a single isolated instance of harassment will not suffice to establish a hostile work environment unless it was extraordinarily severe." *Id*. at 153.  Furthermore, "consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105 (2002).

Brown has failed to raise a genuine issue of material fact as to whether his workplace was permeated with discriminatory harassment that was severe or pervasive enough to alter the conditions of his work environment.  Brown primarily relies on a 2007 incident to support this claim. In 2007, after Brown refused to display a Christmas tree at Walsh, a Board member, Paul D'Angelo, publicly accused Brown in the media of "declaring war on Christians."  (ECF No. 44-4 at 192-93.)   Brown testified that D'Angelo's comment implicated his race in that it communicated to "white folks throughout the country" that "[he] was a Muslim, which was the popular way of saying 'nigger.'"  (*Id*. at 193.)  As a result of D'Angelo's comment, Brown received

"death threats, Christmas cards that said 'Merry Fucking Christmas' on [them], [and] endless phone calls from all over the country." (*Id*.) Brown further testified, that when he met with "Pat Hayes, who at the time, was the chief of the Board" to discuss D'Angelo's actions, Hayes informed Brown that "there was nothing he [could] do" because D'Angelo was a "rogue Board member." (*Id*. at 198.)

The 2007 incident does not raise a genuine issue of material fact as to whether Brown's work environment was racially hostile. Brown concedes that no Board member – including D'Angelo – ever made a racially derogatory comment. (ECF No. 44 at 23.) Brown was called a "Muslim" by anonymous members of the public as a result of D'Angelo's report to the media, but the word "Muslim" is not a racial epithet, even if Brown interpreted it as such. And Brown points to no evidence suggesting that the death threats received from members of the public were racially motivated. Furthermore, there is no evidence in the record suggesting the comments and threats received from members of the public could be attributed to the Board. *Boakye-Yiadom v. Laria*, No. 09-cv-622, 2012 WL 5866186, at *10 (E.D.N.Y. Nov.19, 2012)(rejecting hostile work environment claim in part because "the comments by Jackson, who was not an employee of the School District….[could not] be imputed [to] the defendants."). Finally, even if the 2007 incident constituted an instance of discriminatory harassment attributable to the Board, "a single isolated instance of harassment" generally "will not suffice to establish a hostile work environment." *Howley*, 217 F.3d at 153.

Brown also cites other acts that he claims were motivated by race. Specifically, he testified that the Board ignored his challenge to Ouellette's decision to demote him and did not invite him to attend the meeting at which it voted on his demotion. (ECF No. 44-4 at 209-10.) This is partly just a refashioning of his discriminatory demotion claim, and while it may be considered as part

of the totality of circumstances, it falls far short of raising a genuine issue about whether his workplace was "permeated with discriminatory intimidation, ridicule, and insult." *See Hughes v. Xerox Corp.*, 37 F. Supp.3d 629, 648 (W.D.N.Y. 2014)(hostile work environment claim "is a wholly separate cause of action designed to address other types of work place behavior [than discriminatory adverse employment actions], like constant jokes and ridicule or physical intimidation.")(internal quotation marks and citation omitted).  Further, Brown offers no evidence to suggest that the failure to invite him to the vote on his demotion was discriminatory or even out of the ordinary.

Brown also cites evidence that the Board struggles to retain black and Hispanic administrators, that it has only two black and three Hispanic principals (one of whom is Brown), and that fewer than 5% of recent hires by the Board were racial minorities.  (ECF No. 44-5 at 3-13, *id.* at 110-13.)  He also cites a newspaper article referring to an investigation of the Board's hiring and retention practices by the Connecticut Commission on Human Rights.  (ECF No. 44-3 at 135-36.)  None of this evidence raises a genuine issue about a hostile work environment, however, because, by themselves, an investigation and weaknesses in hiring and retaining black and Hispanic employees do not suggest that Brown faced "discriminatory intimidation, ridicule, and insult" or other racially motivated harassment.  Nor does this evidence suggest "unreasonabl[e] interfere[nce] with…[Brown's] work performance."  *Howley*, 217 F.3d at 154 (internal quotation marks and citation omitted).

Finally, with respect to his hostile work environment claim against Ouellette in Count Two, Brown offers virtually no evidence.  Ouellette did not work for the Board at the time of the 2007 "Christmas tree" incident, and Brown offers no evidence that she made race-based or other discriminatory comments or innuendo.  Brown argues that at times she and the Board did not

provide adequate support for him or for programs at Walsh, but he offers no evidence that any such lack of support was discriminatory or motivated by his race.

Because there is no evidence in the record from which a reasonable juror could conclude that Brown's "workplace [was] permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment", *Howley*, 217 F.3d at 154, the Defendants are entitled to summary judgment on his hostile work environment claim.

### C.    Count Three: Retaliation Claims

In Count Three of his amended complaint, Brown asserts that the Board engaged in "selective discriminatory employment practices…against the plaintiff, which constituted clear and unequivocal retaliation in violation of….Title VII, the Connecticut Constitution and the United States Constitution." (ECF No. 17 at 15.)

Brown claims that the Board retaliated against him by placing him on administrative leave and demoting him following two events.  The first, in the summer of 2012, involved Brown's convening "an open meeting with the Walsh community in Waterbury to discuss the proposed changes that could occur at Walsh," including curriculum changes and the possibility he could be transferred to another school.  (*Id*. at ¶ 35)  Brown alleges his activities in connection with the meeting constituted "protected activity of free speech of public concern under the Connecticut Constitution and United States Constitution."  (*Id*. at ¶ 38.)  Brown hosted the meeting after he had "attended a meeting near the summer of 2012 with the defendants where the defendants decided to make changes to [] Walsh's educational mission and/or educational system."  (*Id*. at ¶ 33.)  After the summer 2012 meeting, Brown claims, Ouellette and the Board "accused Brown of attempting to turn the Walsh community against them."  (*Id*. at ¶ 37.)  The

second event involved Brown's filing of complaints with the EEOC and the CHRO alleging discriminatory conduct by the Defendants after he was placed on administrative leave.  (*Id*. at ¶ 42.)  The Board argues that Brown has not adduced sufficient evidence to satisfy the causation elements of his Title VII and First Amendment retaliation claims.

                1.   Title VII Retaliation Claim

                a.   Prima Facie Case

"In order to show a prima facie case of retaliation in response to a motion for summary judgment, a plaintiff must submit sufficient admissible evidence to allow a trier of fact to find: (i) conduct by the plaintiff that is protected activity under Title VII; (ii) of which the employer was aware; (iii) followed by an adverse employment action of a nature that would deter a reasonable employee from making or supporting a discrimination claim; (iv) that was causally connected to the protected activity." *Cox v. Onondaga Cnty. Sheriff's Dep't*, 760 F.3d 139, 145 (2d Cir. 2014). "[A] plaintiff making a retaliation claim under [Title VII] must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer...which is more demanding than the motivating-factor standard...." *Univ. of Texas Sw. Med. Ctr. v. Nassar,* ––– U.S. ––––, 133 S.Ct. 2517, 2534 (2013).  A court may accept temporal proximity between an employer's knowledge of a protected activity and an adverse employment action as sufficient evidence of causality to establish a *prima facie* case.  *Summa v. Hofstra Univ.*, 708 F.3d 115, 127–28 (2d Cir. 2013)("We have regularly held that the causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action.")(internal quotation marks and alterations omitted).

"Once an employee establishes a prima facie case, the burden shifts to the employer to put forth evidence of a non-retaliatory rationale." *Cox,* 760 F.3d at 145. "[T]he defendant's explanation of its legitimate reasons must be clear and reasonably specific" so that "the plaintiff [is] afforded a full and fair opportunity to demonstrate pretext." *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 258 (1981)(quotation marks omitted). "Once the employer has done so, the employee may prevail by demonstrating that the stated rationale is mere pretext." *Cox,* 760 F.3d at 145. "The employee at all times bears the burden of persuasion to show a retaliatory motive." *Id.*

The Board argues that Brown has failed to meet the causation element of the *prima facie* case, but at the *prima face* stage, "presentation of a temporal connection is enough, in and of itself," to find causation. *Summa,* 708 F.3d at 127. On April 15, 2013, Brown filed complaints with the CHRO and EEOC alleging that the Defendants discriminated against him by placing him on administrative leave based on his race. (ECF No. 41-8 at 8.) The Board does not dispute that it learned of these complaints before July 26, 2013, the date it demoted Brown to vice principal and transferred him to Kingsbury Elementary School. (ECF No. 41-6 at 9-10.) The filing of complaints occurred a little over three months before the demotion — which is not "prohibitively remote" under Second Circuit caselaw. *Summa*, 708 F.3d at 128 (finding that seven months between the retaliatory action and the protected activity satisfied causal requirement)*; see also Gorman–Bakos v. Cornell Coop. Extension of Schenectedy Cty.*, 252 F.3d 545, 555 (2d Cir. 2001)(suggesting the lapse of five months between protected activity and retaliation may show a causal connection); *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009)(concluding that lapse of "only six months between dismissal of [plaintiff's] lawsuit" and

retaliatory conduct was sufficient for causal connection).  Accordingly, Brown has shown a *prima facie* case.

b.   Legitimate Non-Discriminatory Reason

The Board argues that it demoted Brown for legitimate, nondiscriminatory reasons, namely, what it learned from "the Audit Report, the Dorsey Report, the information given to [Ouellette] at [the] meeting with members of the Waterbury Teachers Union and Mr. Brown's unwillingness to accept any responsibility for the issues raised in the Audit and Dorsey Reports." (ECF No. 41-7 at ¶ 19.)  This statement is adequate to shift the burden back to Brown.

c.   Pretext

To establish pretext – that "the retaliation was a but-for cause of an adverse employment action" – a plaintiff can "demonstrate weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action.  From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason....Temporal proximity alone is insufficient to defeat summary judgment at the pretext stage....However, a plaintiff may rely on evidence comprising her prima facie case, including temporal proximity, together with other evidence such as inconsistent employer explanations, to defeat summary judgment at that stage."  *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846-47 (2d Cir. 2013); *see El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010)(affirming summary judgment for employer where employee "produced no evidence other than temporal proximity in support of his charge that the proffered reason for his discharge was pretextual").

There is evidence in the record from which a reasonable juror could conclude that but for Brown's filing of the CHRO and EEOC complaints on April 15, 2013, he would not have been

28

demoted to vice principal.  First, as discussed above, Brown offers evidence that the Board treated similarly situated employees (i.e., Buckley and Zillo) who were alleged to have engaged in intimidation and bullying, but who did not file complaints or engage in other protected activity, differently than Brown.  Second, Brown asserts -- and the arbitration award concludes -- that the Board failed to follow required procedures, including relying on anonymous reports and failing to give Brown an opportunity to remedy the alleged deficiencies.  (ECF No. 44-4 at 165-68); *see also* (ECF No. 41-6 at 23, 30.)  As noted, an employer's failure to follow internal procedure may serve as evidence of pretext.  Where, as here, "the parties have put forward several alleged causes of the plaintiff's [placement on administrative leave and demotion]: retaliation, unsuitability of skills, poor performance, and inappropriate behavior [such as bullying and intimidation]," the "determination of whether retaliation was a 'but-for' cause, rather than just a motivating factor, is particularly poorly suited to disposition by summary judgment." *Gomez v. Metro. Dist.*, No. 3:11CV1934 JBA, 2014 WL 2765987, at *4 (D. Conn. Jun. 18, 2014).

### 2.  First Amendment Retaliation Claim

"[T]he First Amendment protects a [government] employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos,* 547 U.S. 410, 417 (2006).  In order to state a claim for First Amendment retaliation, a government employee must show that "(1) the speech at issue was made as a citizen on matters of public concern rather than as an employee on matters of personal interest, (2) he or she suffered an adverse employment action, and (3) the speech was at least a substantial or motivating factor in the adverse employment action." *Johnson v. Ganim*, 342 F.3d 105, 112 (2d

Cir. 2003)(internal quotation marks, alterations, and citations omitted).[6]  The Board does not

contest that Brown has satisfied the first two requirements.[7]  But it does contest that he has

adduced sufficient evidence for a reasonable juror to conclude that his participation in the

summer 2012 forum was a substantial or motiving factor in placing him on administrative leave

and subsequently demoting him.

I agree with the Board that he has not.  First, Brown cites no evidence to support his First

Amendment retaliation claim.  His Local Rule 56(a)(2) statement makes no mention of the

summer 2012 meeting (ECF No. 44-1), and the argument on this issue in his brief cites only the

---

[6] Some courts have questioned whether *Nassar*, 133 S. Ct. 2517, which addressed the causation standard for Title VII retaliations claims, should also inform the causation standard for First Amendment retaliation claims under § 1983.  *See Rivers v. N.Y. City Hous. Auth.*, 176 F.Supp.3d 229, 246-47 (E.D.N.Y. 2016)(surveying recent caselaw within Second Circuit and concluding that motivating factor standard, rather than *Nassar* but-for causation standard, remains proper test for First Amendment retaliation claims).  I need not decide that issue here because Brown has failed to raise a triable issue under either standard.

[7] I found no case in which the Second Circuit has addressed whether placement on paid administrative leave pending an investigation, by itself, constitutes an adverse employment action for a First Amendment retaliation claim.  The Second Circuit has held that it does not for a Title VII discrimination claim. *Joseph v. Leavitt*, 465 F.3d 87, 91 (2d Cir. 2006) (In Title VII discrimination context, "administrative leave with pay during the pendency of an investigation does not, without more, constitute an adverse employment action.").  Citing *Leavitt*, another judge of this Court has held that it does not for purposes of a Title VII retaliation claim. *Booth v. Connecticut*, No. 3:09CV2131 MRK, 2011 WL 3611352, at *8 (D. Conn. Aug. 17, 2011)("Turning to the third allegation, it is clear that a reasonable jury would not find that placement on paid administrative leave constitutes an adverse employment action for purposes of a Title VII retaliation claim when an internal investigation is pending.").  This is significant because the standards for an adverse employment action in retaliation claims brought under Title VII and the First Amendment are similar. *Rivers*, 176 F.Supp.3d at 244 ("The standard for an adverse action in the context of First Amendment retaliation is substantially similar to the same inquiry in the Title VII retaliation context.")(internal quotation marks and citation omitted).  Other circuits addressing this issue have reached different conclusions. *Breaux v. City of Garland,* 205 F.3d 150, 158 (5th Cir. 2000)(placement on paid administrative leave is not an adverse action for purposes of a First Amendment retaliation claim); *cf. Dahlia v. Rodriguez,* 735 F.3d 1060, 1078–79 (9th Cir. 2013)(placement on paid administrative leave can be an adverse action for purposes of a First Amendment retaliation claim).  Nonetheless, as this issue was not briefed by the parties, I do not address it.

complaint.  (ECF No. 44 at 37.)  A party opposing summary judgment must point to evidence; he may not rest on the allegations of his complaint. Fed. R. Civ. P. 56(c)(1).

Second, even if the allegations in the complaint were credited, they would not, in light of the sequence of events shown in the record, raise a triable issue on causation.  Brown does not specify the timing of the community meeting at which he discussed curriculum changes beyond alleging it occurred in the "Summer of 2012," but even construing this allegation in the light most favorable to him, it occurred no later than September 2012 – some six months before he was placed on administrative leave.  (In his brief, Brown refers to this period as seven months. (ECF No. 44 at 37.))  Although the Second Circuit "has not drawn a bright line" beyond which the temporal relationship between protected activity and adverse action is too weak to support an inference of causation, *Gorzynski*, 596 F.3d at 110, and has found a period as long as six months to be sufficient "to support an inference of a causal connection," *Espinal*,  558 F.3d at 129, it is also the case that "claims of retaliation are routinely dismissed when as few as three months elapse between the protected activity and the alleged act of retaliation" and there is no other evidence of retaliatory intent.  *Housel v. Rochester Ins. Of Tech.*, 6 F. Supp.3d 294, 308 (W.D.N.Y. 2014)(citing cases); *see also Clark Cty. School Dist. v. Breeden*, 532 U.S. 268, 273 (2001)("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close." (citing cases finding three and four-month periods insufficient; internal quotation marks omitted)).  Here, the record reveals no other evidence of retaliatory intent, and thus the six month period stretches the causal chain.  The gap is even longer between the meeting in the "summer of 2012" and the actual demotion of Brown, which occurred in July 2013 – at least 10 months.

More striking than the attenuation of the causal chain, however, is the fact that it was broken – twice – by intervening events.  *See Tasadfoy v. Ruggiero*, 365 F.Supp.2d 542, 551(S.D.N.Y. 2005)("In this Circuit, an inference of causation is defeated (1) if the allegedly retaliatory discharge took place at a temporal remove from the protected activity; or (2) if there was an intervening causal event that occurred between the protected activity and the retaliatory discharge."); *Dortch v. New York City Dep't of Ed.*, 2016 WL 2621076 *9 (E.D.N.Y. March 23, 2016)(recommended ruling finding that plaintiff teacher failed to establish causation component of prima facie retaliation case where, after he engaged in protected activity, principal received anonymous phone calls from parent complaining about his abusive behavior: "The unsolicited anonymous complaints against [plaintiff], and the unprofessional behavior by [plaintiff] that those complaints revealed, serve to break any chain of causation between [plaintiff's] protected activity" and the adverse action).  The first break in the chain was the March 2013 release by state officials of the Audit Report, which charged that there was an "atmosphere of fear and intimidation" at Walsh and disclosed complaints that Brown was bullying staff.  Ouellette placed Brown and Zillo on administrative leave on March 22, 2013 – shortly after the issuance of the report – and arranged for an independent investigation by Attorney Dorsey.  Although Brown disputes that the ensuing investigation was fair, he does not dispute that it was the report of the Audit Committee that led to Ouellette's placing him on administrative leave and initiating the Dorsey investigation.  (Def.'s LRS ¶¶ 11-13; Pl.'s LRS ¶¶  11-13; *see also* ¶ 16 of Pl.'s "Genuine Issues of Fact Which Remain in Dispute" ("Brown was placed on administrative leave on or about March 22, 2013, just after the state audit report was issued ….").)  There is no evidence that the Audit Report had anything to do with the summer 2012 community meeting; to the contrary, Brown admits that he worked together with Ouellette to persuade the State to designate

Walsh a Turnaround School, a process that triggered the audit and the subsequent report.  (Def.'s LRS ¶ 5; Pl.'s LRS ¶ 5.)  Further, the placement on administrative leave in March 2013 applied to both Brown and Zillo, and there is no evidence that Zillo participated in the summer 2012 community meeting.

The second break in the causal chain was the release of the Dorsey Report, which preceded by only six weeks Brown's July 2013 demotion and was cited in Ouellette's letter announcing that she was considering the demotion.  (ECF No. 41-3 at 2.)  The Dorsey Report largely echoed the findings in the Audit Report and concluded that during Brown's tenure, "educational leadership has been poor, decision-making suspect and the staff demoralized." (ECF No. 41-2 at 18.)  Again, there is no evidence that the Dorsey Report, which Ouellette commissioned after release of the Audit Report, had anything to do with the summer 2012 meeting.  And while there are, as noted above, genuine issues of material fact about the reasons for the Defendants' *response* to the Dorsey Report, there is no evidence in the record suggesting that the summer 2012 meeting – the basis for Brown's First Amendment claim – contributed to that response.  To the contrary, all the evidence in the record concerning Ouellette's and the Board's decisions to demote Brown focuses on the Dorsey Report, the fairness of the investigatory process that led to that report, whether or not Brown received an opportunity to address the deficiencies identified in the report, and whether similarly situated principals received more lenient discipline based on similar reports.  In short, because Brown points to no evidence suggesting he was demoted due to the exercise of First Amendment rights in the summer of 2012, the Board is entitled to summary judgment on the First Amendment retaliation claim.

### 3.   Free Speech Claim under the Connecticut Constitution

Brown also claims the Board violated his rights under the Connecticut Constitution's

freedom of speech clause.  Article First, Section 4, of the Connecticut constitution provides

"[e]very citizen may freely speak, write and publish his sentiments on all subjects, being

responsible for the abuse of that liberty."  The Connecticut Supreme Court has recognized a

private right of action under Article First, Section Four for declaratory or injunctive relief.  *See*

*Lopez v. Smiley*, 375 F. Supp. 2d 19, 24 n.2 (D. Conn. 2005)("As for Mr. Lopez's free speech

claims brought under Article First §§ 4, 5 and 14, the Court notes that…the Connecticut

Supreme Court has recognized a private cause of action seeking declaratory or injunctive relief

under these provisions…")(collecting cases); *Williams v. Walter Ford*, No. 3:14-CV-1181, 2015

WL 8490910, at *9 (D. Conn. Dec. 10, 2015)("Connecticut courts have recognized a private

right of action under Article First, Section Four for declaratory or injunctive relief.").  But I have

not found any state case recognizing a private cause of action for money damages under that

constitutional provision.  *Williams*, 2015 WL 8490910 at *9 (observing that "the Court ha[d]

found no state cases recognizing a claim for money damages under [Article First, Section Four of

the Connecticut Constitution]"); *Marshall v. Town of Middlefield,* No. 3:10-CV-1009, 2012 WL

601783, at *9 (D. Conn. Feb. 23, 2012)("The court finds no cases in which a Connecticut court

has recognized a private right of action for money damages under either section four" of the

Connecticut Constitution); *Lopez*, 375 F. Supp. 2d at 24 n.2 (noting "[the plaintiff] has cited no

case in which a Connecticut state court recognized a similar constitutional tort claim for money

damages").  Thus Brown's claim presents a novel question of Connecticut constitutional law.

At their discretion, district courts "may decline to exercise supplemental jurisdiction over

a claim... if [ ] the claim raises a novel or complex issue of State law."  28 U.S.C. § 1367(c)(1);

*Seabrook v. Jacobson*, 153 F.3d 70, 72 (2d Cir. 1996)("Where a pendent state claim turns on novel or unresolved questions of state law...principles of federalism and comity may dictate that these questions be left for decision by the state courts.").  I decline to exercise supplemental jurisdiction over Brown's retaliation claim under the Connecticut Constitution because it raises a novel question of state law.  Brown's claim under the Connecticut Constitution is therefore dismissed without prejudice.

### D.    Count Three (A): Due Process Claim Against the Superintendent in Her Individual Capacity

Brown's amended complaint includes a §1983 claim against Ouellette in her individual capacity, alleging that she deprived him of a "protected property interest in his employment as a Principal at Walsh" under the Fourteenth Amendment.  (ECF No. 17 at 12.)  Brown claims Ouellette violated his right to procedural due process by (i) "plac[ing] [him] on administrative leave without a prior formal or informal hearing or mechanism to challenge his placement on administrative leave," and (ii) "demot[ing] him to [v]ice [p]rincipal…without a prior formal or informal hearing."  (*Id*.)  Ouellette contends (i) that Brown's placement on administrative leave did not deprive him of a property interest because he received full compensation while on leave, and (ii) that Brown's demotion to vice principal did not violate his due process right because he invoked the collective bargaining agreement's grievance procedures, which provided him all the process that was due.  (ECF No. 41 at 8, 11.)

#### 1.    Brown's Placement On Administrative Leave Did Not Implicate A Property Interest

"Property interests protected by due process are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those

benefits.  To establish such an interest, a plaintiff must show that he or she had a legitimate claim of entitlement to the interest, as opposed to a mere unilateral expectation." *MacFall v. City of Rochester*, 495 F. App'x 158, 159 (2d Cir. 2012)(internal quotation marks, alterations, and citation omitted).  It is well established that "an employee on fully paid leave [is not] deprived of a property right" even if "relieved of his job duties." *O'Connor v. Pierson*, 426 F.3d 187, 199 (2d Cir. 2005).  Throughout his administrative leave, Brown received his full benefits and salary. (Def.'s LRS ¶ 14; Pl.'s LRS ¶ 14.)  Therefore, his placement on administrative leave did not deprive him of a protected property interest.  *See O' Connor*, 426 at F.3d 199 (noting approvingly that "circuits have rejected due process claims that were based on an employee's asserted property interest in doing his jobs (as opposed to receiving a salary)")(citing cases).

2.  Brown Received Due Process In Connection with His Demotion

Ouellette makes no argument that the demotion did not implicate a property interest, and the caselaw would foreclose any such argument. *Ciambriello v. Cty. of Nassau*, 292 F.3d 307, 318 (2d Cir. 2002)("Accordingly, we join a number of other circuits that have concluded that the Fourteenth Amendment protects a property interest in a particular position or rank.")(citing cases).  Once a property interest has been identified, "the second step of the [due process] analysis [] asks what process was due to the plaintiff, and inquires whether that constitutional minimum was provided in the case under review." *Narumanchi v. Bd. of Trustees of Connecticut State Univ.*, 850 F.2d 70, 72 (2d Cir. 1988).  The Second Circuit has "held that [] post-deprivation procedures [such as grievance and arbitration procedures set forth in a collective bargaining agreement], [which] provid[e] for a hearing to contest a challenged employment decision, are sufficient to satisfy due process." *Harhay v. Town of Ellington Bd. of Educ.*, 323 F.3d 206, 213 (2d Cir. 2003).

The record shows that Brown's employment with the Board was governed by a collective bargaining agreement.  (Def.'s LRS ¶¶ 23-25; Pl.'s LRS ¶¶ 23-25.)  Under that agreement, Brown filed a grievance challenging his demotion to vice principal and transfer to Kingsbury Elementary School.   (Def.'s LRS ¶ 24; Pl.'s LRS ¶ 24.)  Brown completed all the grievance procedures set forth in the collective bargaining agreement, including participating in an arbitration hearing.  (Def.'s LRS ¶ 25; Pl.'s LRS ¶ 25.)  After the hearing, the arbitration panel issued an award ordering that Brown be reinstated to the rank of elementary school principal and receive back pay for the period of his demotion.  (ECF No. 41-6 at 31.)

The fact that the collective bargaining agreement "established grievance and arbitration procedure, and [Brown] took advantage of these procedures by filing [a] grievance[] that [was] considered by the Board by pursuing arbitration" is sufficient to satisfy due process.  *Harhay*, 323 F.3d at 213.  Further, it is undisputed that before he was demoted, Brown was advised that Ouellette was "considering reassigning [him] to a position other than elementary school principal" and invited him to a meeting at which he would receive "an opportunity to be heard regarding [his] possible reassignment."  (ECF No. 41-3 at 2.)  Taken together, the pre-deprivation notice and post-deprivation CBA grievance procedure easily satisfied due process. *See Wojcik v. Massachusetts State Lottery Comm'n*, 300 F.3d 92, 102 (1st Cir. 2002).

### 3.   Brown's Liberty Interest Claim Fails

Brown asserts – for the first time – that "[i]n addition to his property interest being implicated,…his being placed on administrative leave, and then subsequently demoted in the wake of the very public disclosure of the Audit Report and Dorsey Report, implicate his liberty interests."  (ECF No. 44 at 28-29.)  This is known as a "stigma-plus" theory. *Patterson v. City of Utica*, 370 F.3d 322, 330 (2d Cir. 2004)("For a government employee, a cause of action under §

1983 for deprivation of a liberty interest without due process of law may arise when an alleged government defamation occurs in the course of dismissal from government employment…This type of claim is commonly referred to as a stigma-plus claim.")(internal quotation marks and citation omitted).  But Brown's claim fails because (i) it is not in his amended complaint, and (ii) in any event, the evidence in the record does not support it.

Count Three of Brown's amended complaint pleads that he was deprived of his "protected property interest as a Principal at Walsh Elementary" but makes no reference to a liberty interest.  (ECF No. 17 at 12.)  A party is barred from raising new theories or claims when responding to a motion for summary judgment.  *See e.g.*, *Thomas v. Egan*, 1 F. App'x 52, 54 (2d Cir. 2001)("It is inappropriate to raise new claims for the first time in submissions in opposition to a summary judgment motion."); *Coppola v. Connecticut Student Loan Found.*, No. CIV. A. N-87-398, 1989 WL 47419, at *3 (D. Conn. Mar. 22, 1989)("Plaintiff's counsel previously has been reminded, in another case, that a memorandum in support of a motion for summary judgment is not the proper place to present new claims which, in effect, amend the complaint.").

Even if Brown had properly alleged a "stigma plus" claim, such a claim would fail because there is no evidence in the record that Ouellette made any false statement.  *O'Connor v. Pierson*, 426 F.3d 187, 195 (2d Cir. 2005)("To succeed on [a stigma-plus] claim, [a plaintiff] must prove two things: 1) some action by the Board imposing a tangible and material burden, and 2) utterance of a false statement that damaged his reputation in connection with the burdensome action.").  Brown points to no evidence that Ouellette "utter[ed]…any false statement" and therefore "[Brown's] stigma-plus claim…necessarily fail[s]." *Id*.

**IV.      Conclusion**

For the reasons set forth above, I GRANT IN PART AND DENY IN PART Defendants'

motion for summary judgment.  Defendants are entitled to summary judgment on Brown's Title

VII hostile work environment claim in Counts One and Two, his procedural due process claim in

Count Three (A), and his retaliation claim under the First Amendment in Count Three.  Brown's

retaliation claim under the Connecticut Constitution in Count Three is dismissed without

prejudice under 28 U.S.C. § 1367(c)(1).  The following claims remain: the Title VII

discriminatory demotion claim in Counts One and Count Two, and the Title VII retaliation claim

in Count Three.

Jury selection is set for November 8, 2017.  The parties shall file their joint trial

memorandum within 90 days of this order in accordance with my instructions for such a

memorandum (available on the undersigned's website).

Should the parties wish to proceed to mediation, they shall jointly file a statement within

14 days, certifying that (1) counsel have conferred with their clients and each other, (2) the

parties wish to proceed to mediation, (3) the parties are willing to participate in settlement efforts

in good faith, and (4) counsel believe that a mediation stands at least a reasonable chance of

resolving the case without trial.  If they file such a statement, I will postpone the deadline for the

filing of the joint trial memorandum until 45 days after the parties' mediation (but no later than

30 days before trial).

IT IS SO ORDERED.

/s/ _____

Michael P. Shea, U.S.D.J.


Dated:        Hartford, Connecticut
             March 28, 2017